MIDWEST DEVELOPERS, Plaintiff-Respondent,

v.

GOMA CORPORATION, Don Goben, Barbara Goben, and
Goben Cars, Inc., Defendants-Appellants.

Court of Appeals

No. 83–258. Submitted on briefs April 10, 1984.—
Decided November 27, 1984.
(Also reported in 360 N.W.2d 554.)

633

For the defendants-appellants the cause was submitted on the briefs of *Donald L. Heaney, Michael J. Lawton, Kenneth B. Axe* and *Isaksen, Lathrop, Esch, Hart & Clark* of Madison.

For the plaintiff-respondent the cause was submitted on the brief of *Leslie Brodhead Griffith* and *Ross and Chatterton* of Madison.

Before Gartzke, P.J., Dykman, J. and Bruce F. Beilfuss, Reserve Judge.

DYKMAN, J. Defendants Goma Corporation (Goma), Goben Cars, Inc. (Goben Cars), and Don and Barbara Goben appeal from a default judgment of $357,390.93 granted as a sanction for their failure to comply with a discovery order. Appellants, represented on appeal by different counsel, argue that: (1) the trial court lacked the power to impose the sanction; (2) they were denied due process of law guaranteed by the fourteenth amendment to the United States Constitution because the court held no hearing and made no finding as to their contempt, good faith or ability to comply with the discovery order before granting default judgment; (3) the trial court erred by ordering judgment against all defendants for the acts of Goma; and (4) the trial court granted a default judgment without an evidentiary hearing to determine the amount of damages. Because we conclude the court had the power to impose the sanction, that defendants were afforded due process, that it was not error to grant a default judgment when defendants had chosen not to challenge the amount of damages claimed and not error to order judgment against the officers of a corporation, we affirm.

Don Goben was the sole stockholder in Goma, its organizer, president, chief operating officer, chair of the board of directors and treasurer. His wife, Barbara,

was Goma's secretary. Goma acted as a holding company for Goben Cars, of which Don Goben was president. Goma also negotiated automobile leases with federal government agencies, and procured investors who would buy the automobiles which became subject to the leases. It acted as trustee for the lease payments received from the federal government.

The leases required Goma to perform all repair and maintenance service on the automobiles during the lease term. Goma retained a portion of each lease payment to cover the maintenance and repair costs and the balance was to be remitted to the investors. At the end of the lease term the investors could choose whether to take possession of the cars or allow Goma to sell them back to Goben Cars. The initial investors focused only on the tax benefit from the arrangement.

Three investors assigned their interests to Midwest Developers (Midwest). Midwest expected to profit on the sale of the cars after the leases expired. However, two of the three investors had previously agreed that Goma could sell their cars back to Goben Cars. The third, Meyer, had not. Goma refused to deliver any of the cars to Midwest. In June 1976 Midwest brought this action against Goma, Goben Cars, and the Gobens for an accounting of all receipts and disbursements relevant to the cars, for return of vehicles for which leases had terminated, and for removal of Goma as trustee.

Defendants counterclaimed, stating that they had supplied an accounting of all sums due under the lease agreements. On February 2, 1977, Judge Torphy ordered that discovery be completed by April 1, 1977 and that defendant "furnish disposition information . . . (i.e. sales price, charges against cars for preparation for sale, etc.) by 2/15/77 on cars already disposed of and within 10 days after each disposition thereafter." Defendants' undated response to Midwest's pre-trial interrogatories objected to almost all the requests for information because they were "irrelevant, immaterial, unduly burdensome

upon defendants, confidential business information", but stated that Don and Barbara Goben and an employee, O.B. Baker, represented "each and every employee or agent of defendants, Goma Corp., and Goben Cars, Inc., authorized to act on behalf of said defendants in respect to the execution and performance of the contracts . . . ."

The record contains no transcript or clerk's notes of the trial that was held July 11, 1977.

The trial court's memorandum decision of February 17, 1978, stated: "With regard to *all* cars the plaintiff, as the 'owner' or 'purchaser' pursuant to exhibits 3, 7 and 11, is entitled to a full accounting from Goma, the trustee, as to lease payments, credits, debits, loan payments, maintenance charges, sale, etc." (Emphasis in original.) The court found that Goma had refused to account to Midwest and ordered it to do so within 30 days of the judgment which was entered March 20, 1978. It also ordered Goma, Goben Cars, Don and Barbara Goben to immediately deliver to Midwest written authorization to recover possession of the Meyer vehicles that were not presently leased to the U.S. government, together with executed titles and a statement as to the whereabouts of the cars.

Midwest brought an order to show cause to be heard April 6, 1978 why defendants should not be punished for contempt because they had failed to comply with the court's judgment requiring execution and delivery to Midwest of title to the Meyer vehicles. Midwest's accompanying affidavit stated that defendants had refused to deliver title "until certain demands relating to the vehicles not the subject of this law suit are complied with." The affidavit stated that Midwest had effected a sale of three vehicles, but because of its inability to deliver title, one purchaser now refused to continue with the purchase and the remaining two purchasers were about to cancel their purchases. There is no record of whether

a hearing on the order was held on April 6, 1978 as scheduled.

Midwest also brought an order to show cause to be heard April 26, 1978 why judgment should not be granted against defendants in the sum of $276,673.84 because of their failure to give the accounting within 30 days as required by the court's interlocutory judgment of March 17, 1978. The accompanying affidavit included an estimate of the unaccounted lease proceeds. The estimate was based on a report prepared by defendants' accountant and Midwest's review of the lease documents. There is no order or transcript of the hearing in the record. Midwest, in a June 2, 1978 affidavit, stated that the judge, at defendants' request, extended the time for defendants to present an accounting to June 1, 1978.

On June 2, 1978 Midwest moved for sanctions for the failure of defendants to furnish an accounting and requested the court to grant judgment against defendants in the sum of $267,673.84 or to require defendants to post a bond of $300,000 to guarantee payment of judgment, costs and interest in the action as a condition of the presentation of further testimony. An accompanying affidavit made by Byron Frenz, an officer of and attorney for Midwest, alleged that the accounting given by defendants dated July 22, 1976 failed to list the defendants' gross receipts from the leases. The affidavit also said that the information Midwest received June 1, 1978 included a copy of a letter dated May 26, 1978 from O.B. Baker to defendants' attorney. in which he said:

We are mailing you today, under separate cover, the Income and Expense Work Sheets on cars that were owned by [the investors]. You will note that the expense sections (maintenance, etc.) have not been totaled and are not complete.

We have spent an estimated 80 man hours on this work and estimate that it will take an additional 30 to 40 hours to complete. Prior to November of 1975, this

company did not maintain expense records on each individual car which means that we must check each and every maintenance bill paid by the company to find expenses that would pertain to the above mentioned vehicles.

. . . .

To properly compute our overhead expenses, it will be necessary to find out the number of vehicles operating each month during the period of these contracts . . . .

I give you the above to help you understand the time and work involved in compiling this information. We will continue to work on this and keep you posted on progress. . . .

The Frenz affidavit also said that the statements made in one letter as to the maintenance expense records were directly contrary to statements made by Goben at trial, and that neither the contracts nor the judgment of the court in any way authorized the payment of "overhead expenses" and the determination of such overhead expenses was not required in order to make an accounting. The Frenz affidavit also said that Goma had moved a substantial portion or all of its operations to Florida; that on the numerous occasions Frenz had attempted to contact Don Goben he had been advised that Goben was out of the country.

After a hearing, the trial court entered an order July 2, 1978 requiring defendants to account for the disposition of the repurchase price of the vehicles sold before July 22, 1978 whose government lease had terminated, and to respond to Midwest's interrogatories by August 1, 1978.

July 31, 1978 Midwest renewed its motion for sanctions and moved the court to grant judgment against defendants in the sum of $276,673.84 or to require defendants to post a bond sufficient to guarantee payment of judgment, costs and interest. In an accompanying affidavit Frenz stated that defendants had not accounted for the repurchase price of the cars resold to Goben Cars. On

July 26, 1978, defendants moved for a protective order to block Midwest's discovery of defendants' tax returns.

The record contains no transcript but includes clerk's notes of the August 21, 1978 hearing on Midwest's motion for sanctions and defendants' motion for a protective order. The clerk's notes show that defendants' counsel stated that the boxes of papers defendants had produced in response to Midwest's interrogatories contained the purchase price of the resold cars The notes also show that the trial court reiterated that defendants were obligated to give Midwest an accounting, ordered that the records in the boxes be duplicated for Midwest within ten days and decided that since defendants had furnished everything they had, it would not impose sanctions. The record contains no order resulting from this hearing.

On November 8, 1978 defendants moved for summary judgment dismissing Midwest's claims. On January 31, 1979 defendant moved the court for an order continuing a trial scheduled for the week of February 12, 1979 to a future date. There is no transcript in the record of the hearing held on these motions on February 12, 1979 but the clerk's notes show that Midwest had a computer printout as to damages and that the parties would attempt to take a deposition of the programmer for trial purposes and to settle their differences. The record includes the transcript of a deposition taken that day of Peg Bubon, an employee of Midwest's attorneys who had prepared the computer printout, but no order resulting from the hearing.

The record contains nothing more until Midwest's December 4, 1980 notice of motion for judgment and/or sanctions against defendants for failure to furnish an accounting.

The hearing on Midwest's motion for judgment and/or sanctions was held February, 1981, before a successor trial judge, Judge Byrne. There is no transcript in the

record, but the clerk's notes show defendants argued that no final order existed and that an accounting by gross lease income did not exist. They show also that the previous judge, Judge Torphy, was called in to testify, that he reiterated that the Gobens were trustees and were to provide an accounting and that he agreed to set forth his reasoning on what the accounting should consist of. A summary of Judge Torphy's reasoning is not in the record. September 18, 1981 Judge Byrne issued his decision on Midwest's motion. He ordered defendants to:

[F]urnish to plaintiff within 75 days of the date of this order, a complete and full accounting as required by the judgment entered in said matter and filed under date of March 20, 1978. . . . In the event that defendants fail to comply with this order . . . the Court shall strike the defendants' answer and proceed with the matter as a default action.

Defendants filed a motion on October 8, 1981 asking the trial court to reconsider its decision because the information required for the accounting was immaterial and irrelevant, that none of the defendants except Goma had the information necessary for an accounting or were responsible for any accounting to Midwest, that the records necessary to provide the accounting ordered[1] never existed because Goma maintained records on a lease by lease and not a car by car basis, that "the employees of Goma Corporation who maintained the lease records are no longer employed by Goma Corporation" and that the records were no longer located in one central location.

Defendants' attorney did not appear at the November 12, 1981 hearing on their motion to reconsider the order. The court found that the information requested was relevant, acknowledged that it could have been more easily produced two and one-half years previously, and affirmed the order. Defendants' attorney appeared at the courtroom as the trial judge was leaving for the day and engaged in a 20 minute *ex parte* discussion of the

case. The judge wrote in his memorandum to the file that the defendants requested a further extension of time; stated that the previous judge had never issued an "order," but had directed Goma to prepare the accounting and asserted that an accounting could not be provided in the form in which it had been ordered because records were maintained on a lease-by-lease basis. The judge noted that he informed defendants' attorney that he found "that Don and Barbara Goben were in fact Goma Corporation, so that this misnomer was immaterial as far as I was concerned" and advised him to

provide all information that he possibly can, and if there are some aspects of the decision that he cannot comply with he should so state . . . and [state] the reasons therefore. It would then be up to the court to determine whether the accounting is acceptable and proper in light of the September 18 order . . . .

The record contains no response to the trial court's order to comply with a complete and full accounting other than affidavits of the Gobens as individuals and Don Goben as president of Goma and of Goben Cars, signed in Florida and filed with the clerk of Dane County circuit court. The affiants denied that they ever had the information or records necessary to prepare the accounting, saying that they did not know of the whereabouts of those Goma employees who did and that they had never individually been ordered to submit an accounting by the court.

September 28, 1982 a third successor judge, Judge Pekowsky held a hearing on Midwest's renewed motion for judgment in the amount of $276,673.84, plus interest. In its December 15, 1982 ruling on the motion the court said:

[D]efendants have, in fact, completely failed and refused to file an accounting as required consistently by the judgment of Judge Torphy, the subsequent order of

Judge Byrne, and plaintiff has been substantially prejudiced in its rights. . . .
. . . More than adequate time has been given to the defendants herein to comply with earlier court orders. . . . It would be inappropriate, at this time, to enter any extensions for any further accounting . . . .
Further, the Court is persuaded that, in fact, the defendants do not now intend to file such required accounting, having argued that they cannot comply, if, indeed, such an order for accounting exists. As recited above, this Court has no question that such orders for accounting were, clearly, entered by at least two judges.

The court ruled that "[i]nasmuch as the defendants have declined to so account, plaintiff is entitled to judgment as and for sanctions for the failure to furnish the accounting in this action" and awarded $276,673.84, with interest and costs.

The order was stayed until a hearing on December 31, 1982, when defendants argued for a further extension. The trial court granted defendants a stay of execution until January 7, 1983, to allow them time to post a $50,000 appeal bond.

*Power To Impose Sanction*

Defendants argue that the trial court lacked the power to impose the sanction used or erred because the sanction was not a matter within its discrtion. Section 804.12 (2)(a), Stats., provides in part:

If a party or an officer, director or managing agent of a party . . . fails to obey an order to provide or permit discovery, . . . the court in which the action is pending may make such orders in regard to the failure as are just, and among others . . . .
3. An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part there-

of, or rendering a judgment by default against the disobedient party.

4. In lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders . . .

In *In re Estate of Glass*, 85 Wis. 2d 126, 146–47, 270 N.W.2d 386, 396 (1978), the court said "[s]ec. 804.12 (4), Stats., does not require a violation of a discovery order to justify sanctions. Failure to comply with the statutory directive is sufficient . . . . [T]he imposition of sanctions is discretionary with the court." We conclude that the trial court had power to impose the sanction.

### Due Process Denied When Judgment Rendered Without Evidentiary Hearing?

In *Hauer v. Christon*, 43 Wis. 2d 147, 150–51, 168 N.W.2d 81, 83 (1969), the court discussed a trial court's inherent power to strike a defendant's pleading and said "[b]ut such inherent power is not exercised on the basis of contempt but upon the necessity of the court to maintain the orderly administration of justice and the dispatch of its business." The court held that the exercise of the power to strike an answer and grant a default judgment, whether the power is inherent or given by statute, is limited by the requirement of due process of the fourteenth amendment of the United States Constitution. *Hauer*, 43 Wis. 2d at 154, 168 N.W.2d at 84–85. The court quoted the general rule that "the fundamental conception of a court of justice is condemnation only after hearing" citing *Hovey v. Elliott*, 167 U.S. 409, 413 (1897), but noted that the rule was modified when a defendant failed to produce material evidence in its possession, as was the case in *Hammond Packing Co. v. Arkansas*, 212 U.S. 322 (1909). In that case the de-

fendant did not comply with an order for inspection of its books, so its answer was struck and a default judgment entered against it.

In *Hauer*, 43 Wis. 2d at 152, 168 N.W.2d at 83–84, the court said:

This judgment was affirmed by the supreme court and *Hovey* was distinguished on the ground it involved the denial of all rights to defend as a mere punishment while the *Hammond Case* was a failure of the defendant to produce material evidence in its possession. The court found the sanction for its action in the law-making power to create a presumption of fact as to the bad faith and the untruth of the answer begotten from the suppression or the failure to produce the evidence. The supreme court took the view that the striking of the answer and the granting of the default judgment was only remotely punishment and the generating force of the power was the right to create a presumption flowing from the failure to produce. In this view, due process was denied in a contempt by the refusal to hear the case while due process was preserved in the *Hammond Case* by the presumption that the refusal to produce evidence material to the administration of due process was an admission of want of merit in the asserted defense.

In *Dubman v. North Shore Bank*, 75 Wis. 2d 597, 600–01, 249 N.W.2d 797, 799 (1977), the court held that while the sanction of striking a pleading when exercised as a contempt penalty, "without evidence warranting a finding of no merit or bad faith," was a denial of due process, *Dubman* was distinguishable from contempt cases because, "[t]he power can be exercised when evidence is withheld which relates to an essential element of the defense so as to warrant a presumption of fact that the defense has no merit."

The sanction imposed in this instance, as in *Hammond*, was not for contempt of court but "upon the necessity of the court to maintain the orderly administration of justice and the dispatch of its business."

*Hauer*, 43 Wis. 2d at 151, 168 N.W.2d at 83. This was an action for an accounting. Midwest alleged that Goma refused to account for the monthly rentals received from the government agencies and refused to account for additional rent Goma received because of excess mileage on the automobiles. Without this information, Midwest could not prove how much money it was owed. Only defendants had this information. Their refusal to provide it totally frustrated Midwest's attempts to show the amount of money it was owed. Midwest ultimately relied upon a report prepared by defendants' accountant and copies of the leases to conclude that defendants owed Midwest $276,673.84. In its decision on defendants' motion for a stay of execution the court said:

I do believe that a sanction is, clearly, in order because of the findings of Byrne and Torphy, and I'm only following these findings, and because of the length of time and the magnitude of the problem and the financial situation, in general. Sanctions are, indeed, called for in this case, and, perhaps, of the severest nature, assuming that all those decisions are correct, as I have done, and that the accountings were required. I reached that stage after going through the file and was prepared to enter a severe sanction.

The motion before me was for judgment in a given amount, and, at first, I wanted only to enter a judgment and to have separate hearing on the issue of damages. I, then, in looking through the file, realized that what we were talking about is the same thing, going around in a "Catch 22" situation, wherein, without the accounting, we couldn't proceed to find and try the issue of damages, which is the essence of what we were talking about anyway, so I did enter the memorandum decision, which was, indeed, a very harsh result, with the figure of damages that requested, because I knew of no way, with further proceedings, in light of what had gone on before, with any clearness, that this matter could be resolved such that those damage figures could ultimately be determined in some reasonable respect, without accurate accountings. Of course, I had great concern about the dollar damages, here.

The requirements of due process were met "by the presumption that the refusal to produce evidence material to the administration of due process was an admission of want of merit in the asserted defense" that no money was owing to Midwest. *Hauer*, 43 Wis. 2d at 152, 168 N.W.2d at 84.

### Ability To Comply With the Order

Defendants argue that they were unable to produce the information Midwest needed, and therefore the trial court's sanction for refusal to supply the information denied them due process of law.

In *In re Adam's Rib, Inc. (Kaminsky)*, 39 Wis. 2d 741, 159 N.W.2d 643 (1968), Kaminsky's defense consisted of denials of possession of the records sought and knowledge as to their whereabouts. He argued on appeal that he was being compelled to do something not within his power. The court said that because defendant delivered some of the records the trial court could infer that he had or should know the whereabouts of the remainder. The court held that:

The burden was not upon the respondents to prove the appellant could comply with the order of the court. It was, at this point in the proceeding, incumbent upon the appellant to offer some satisfactory explanation of his failure to comply with the court's specific and direct order . . . .

*Id.* at 747, 159 N.W.2d at 647. The court concluded:

The trial court's conclusion that Kaminsky was not in good faith was within its province and is not to be invaded by this court unless clearly erroneous. . . .
. . . If all one need do to invade the order is deny possession of each and every item sought when the circumstances point to possession, then the order is without practical effect.

*Id.* at 750, 159 N.W.2d at 648.

In *Furrenes v. Ford Motor Co.*, 79 Wis. 2d 260, 266, 255 N.W.2d 511, 514 (1977), the court said:

[N]o substance is found in appellant's contention that he was deprived of a hearing before dismissal due to noncompliance. A hearing was held, back on October 3, 1974, to determine whether the tie rod should be produced. Plaintiff made no contention then that the tie rod did not exist. The original trial judge, after assurance by plaintiff's counsel that the tie rod was then being inspected by plaintiff's expert, ordered production of the tie rod for testing within thirty days of October 3, 1974.

The order now challenged . . . was merely an order granting additional time to produce the tie rod, already compelled to be produced eight months earlier. Since the original order to produce was not challenged as to validity or notice, the second order cannot be belatedly challenged on either score after the extended deadline for compliance has passed.

In *Household Utilities, Inc. v. Andrews Co.*, 71 Wis. 2d 17, 29, 30, 236 N.W.2d 663, 669 (1976), the court said:

The intent of the parties in a case such as this must necessarily be derived from a consideration of their words, written and oral, and their actions. . . .
. . . the finding of the trial court [as to intent] is not against the great weight and clear preponderance of the evidence.

In this case defendants delivered some of the records in response to an interrogatory, which provides a proper basis for an inference that they had or should know the whereabouts of the remainder. *In re Adam's Rib*, 39 Wis. 2d at 747, 159 N.W.2d at 647. They offered nothing other than their own denial to show that they did not have possession of the records.

As in *In re Adam's Rib*, the burden of proof rested on defendants to prove that they could not comply with

the order. The trial court's December 15, 1982 finding that defendants' refusal to comply with the order to provide an accounting was evidence that they did not intend to file one was not clearly erroneous. Therefore we will not reverse it. [1]

Defendants were first ordered to provide information as to the sales price and charges against cars disposed of in February 1977. On June 22, 1977 at a deposition, Don Goben conceded that the "record to show what came in and what went out, credit and debit sort of thing" was kept in Madison, and that

over the years we had several different types of composite sheets that showed me what the income and the expenditures were . . . different accountants used different variations . . . . You know, you can tie it to a specific car, you can tie it to a group of cars as a group, several different ways of doing it. It all comes out about the same.

At his July 8, 1977 deposition, Don Goben indicated that Goma had the records that he now denies Goma has:

[Defendants' Attorney]: "Did you call me and tell me that you would not come out and take a look at the Goma records on Tuesday morning?"

[Counsel for third-party defendants]: "The records that you indicated—so that we can keep it clear—the records that were to be looked at out at Goma had to do with each of the vehicles and the files that had to do with Midwest's interest in this matter, which did not affect

---

[1] "On review of a factual determination made by a trial court without a jury, an appellate court will not reverse unless the finding is clearly erroneous. See sec. 805.17(2), Stats. While we now apply the 'clearly erroneous' test as our standard of review for findings of fact made by a trial court without a jury, cases which apply the 'great weight and clear preponderance' test to the same situation may be referred to for an explanation of this standard of review because the two tests in this state are essentially the same." Noll v. Dimiceli's, Inc., 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct. App. 1983).

us and we decided not to put a burden on our office in going through that part . . ."

[Don Goben] : "We were under Court order. I was under Court order to have people there, to have all the records pertaining to this available on Monday and it is beyond me why you never showed up out there so that we could search out and find out exactly what records you wanted."

Defendants made no claim that the information necessary to an accounting was unavailable to them until October 1981, after successive courts had ordered them to comply with court orders. Numerous hearings were held over the five years of litigation. Defendants now contradict their earlier assurances that the information was available and challenge the order for accounting long after the extended deadline for the original order has passed.

Since the original order to produce the documents necessary for a full accounting was not challenged because of inability to comply, the later order cannot now be belatedly challenged. *Furrenes,* 79 Wis. 2d at 266, 255 N.W.2d at 514.

We conclude that the trial court's findings were not clearly erroneous and that the trial court afforded defendants due process. The trial court did not abuse its discretion in awarding sanctions against the defendants.

### Default Judgment Against Gobens

Section 804.12(2), Stats., gives a trial court the authority to render default judgment if discovery orders are not complied with. It reads :

(a) If a party *or an officer, director or managing agent of a party* . . . fails to obey an order to provide or permit discovery . . . the court in which the action

is pending may make such orders in regard to the failure as are just, and among others . . .

3. An order striking out pleadings or parts thereof . . . or *rendering judgment by default against the disobedient party.* (Emphasis added.)

The trial court's decision whether to render a default judgment is discretionary. *Hollingsworth v. American Finance Corp.,* 86 Wis. 2d 172, 181, 271 N.W.2d 872, 876 (1978). An appellate court will not disturb a trial court's discretionary decision unless the exercise of discretion has been abused. *Hedtcke v. Sentry Ins. Co.,* 109 Wis. 2d 461, 470, 326 N.W.2d 727, 732 (1982). A trial court abuses its discretion if it misapplies or misinterprets the law. *State v. Hutnik,* 39 Wis. 2d 754, 763, 159 N.W.2d 733, 737 (1968).

Defendants argue that the trial court misinterpreted sec. 804.12(2), Stats., when it rendered default judgment against Goma and the individual defendants Don and Barbara Goben. The order for an accounting was directed solely to Goma. Therefore, defendants argue, only Goma can be subject to the default judgment sanction since the other defendants were not ordered to make the accounting.

Section 804.12(2), Stats., provides sanctions if a party or a party's officer, director, or managing agent fails to obey a discovery order. Don and Barbara Goben are the president and secretary, respectively, of Goma and Goben Cars. Don and Barbara are also defendants. Because they are parties and officers of Goma, the trial court could find them to be disobedient and render default judgment against them as well as against Goma.

The trial court's decision to grant a default judgment as a sanction was based on the spirit of noncooperation exhibited by all defendants. Midwest attempted to obtain an accounting from defendants for six years. The various trial judges assigned to this case during that

time issued four discovery orders to this end. Despite these orders, no accounting was ever made. The trial court did not abuse its discretion when it rendered default judgment against all of the defendants.

### Assessment of Damages Without An Evidentiary Hearing

Section 806.02, Stats., governs default judgments. Subsection (2) reads in part: "If proof of any fact is necessary for the court to give judgment, the court shall receive the proof." This proof need not be presented in an evidentiary hearing; it can be submitted in affidavit form. 101 Wis. 2d xii, Judicial Note (1981). As part of this proof, the defendant can introduce evidence to mitigate or be heard as to the diminution of damages. *Smithers v. Brunkhorst,* 178 Wis. 530, 533, 190 N.W. 349, 350 (1922).

At issue here is whether the trial court properly determined that no proof of damages was necessary to render the default judgment. The application of a statute to a particular set of facts is a question of law. *Kania v. Airborne Freight Corp.,* 99 Wis. 2d 746, 758, 300 N.W.2d 63, 68 (1981). An appellate court decides questions of law independently of and without deference to the trial court's decision. *Ball v. District No. 4, Area Board,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984).

There are no Wisconsin decisions that have interpreted when a trial court must receive proof as to damages when a default judgment is granted. When there are no Wisconsin cases on point, an appellate court can look to federal decisions for aid in determining the intent of a Wisconsin statute if a federal statute exists that is similar in language and operation. *State v. Beno,* 99 Wis. 2d

77, 84, 298 N.W.2d 405, 410 (Ct. App. 1980). Federal Rule of Civil Procedure 55 is similar in language and effect to sec. 806.02, Stats.[2] The issue of when it is necessary to have proof of the amount of damages in a default judgment has been considered in a federal court decision.

In *United States v. DeFrantz*, 708 F.2d 310, 312 (7th Cir. 1983), the court held that if defendant had been notified of the amount claimed as damages and never questioned or challenged that amount, then no hearing was required on that issue. In *DeFrantz*, the motion for default judgment as a sanction for failure to permit discovery specified the amount that was claimed and eventually awarded as damages. Because the defendant had been notified in this manner of the amount claimed and raised no objection, the court of appeals determined that no hearing was required.

Here, defendants were made aware of Midwest's claim for damages of $276,673.84 on April 26, 1978. That amount, plus interest, was awarded to Midwest on December 15, 1982 when the default judgment was rendered. Nothing in the record indicates that defendants ever questioned the amount of the damages claimed. The trial court noted at the hearing for stay of execution

---

[2] Section 806.02(2), Stats., provides in part:

If proof of any fact is necessary for the court to give judgment, the court shall receive the proof.

Federal R. Civ. P. 55(b)(2) provides in part:

If, in order to enable the court to enter judgment . . . it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any other matter, the court may conduct such hearings . . . .

The greatest difference that exists between these two subsections is that Wisconsin's rule allows proof to be received by a means other than a hearing while the federal rule contemplates hearings as the only means to establish the truth of an averment.

that it was surprised that there had not been a challenge to the amount of the damages. Defendants had notice of the amount claimed as damages and failed to question that amount. No proof was necessary for the trial court to determine the issue of damages.

*By the Court.*—Judgment affirmed.